***FOR PUBLICATION***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| MEMO MONEY ORDER CO., INC., | : | **Civil No. 10-5460 (FLW)** |
| | : | |
| Plaintiff, | : | **OPINION** |
| v. | : | |
| | : | |
| SIDAMON-ERISTOFF, et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**WOLFSON, District Judge**:

Plaintiff MEMO Money Order Co., Inc. ("Plaintiff" or "MEMO"), moves before the Court to enjoin Defendants Andrew P. Sidamon-Eristoff ("the Treasurer"), Treasurer of the State of New Jersey and Steven R. Harris, Administrator of Unclaimed Property of the State of New Jersey (collectively, "Defendants" or "State"), from enforcing Section 3 of 2010 N.J. Laws Chapter 25 ("Chapter 25"), New Jersey's recent amendment to its Unclaimed Property Act, N.J.S.A. 46:30B-1 et seq., which section modifies the presumptive abandonment period for money orders from seven years to three years.[1]  In its Verified Complaint, Plaintiff raises federal and state constitutional challenges under, inter alia, the Contract Clause, the Takings Clause, and Substantive Due Process. Defendants oppose the motion and move to dismiss the Complaint on the grounds of immunity and abstention.  Recently, the Court rendered decisions in four other related cases which all involve

_____

[1]     The amendment was enacted on June 30, 2010, with an initial effective date of July 1, 2010.  The effective date was subsequently extended to November 1, 2010.  To accommodate the proceedings in this particular case, the Treasurer extended the implementation date as it affects money orders to November 18, 2010.

substantially similar issues regarding the constitutionality of Chapter 25.  Thus,  for the purposes of this matter, the Court will refer to its prior Opinion dated November 13, 2010, wherever appropriate. For the reasons set forth below, the Court denies Defendants' motion to dismiss and denies Plaintiff's motion for injunctive relief.

## BACKGROUND AND PROCEDURAL HISTORY

The following facts are not in dispute unless otherwise noted.  Plaintiff is a multi-state issuer of money orders licensed in New Jersey to issue money orders through authorized delegates in the state.  MEMO's money orders can be used by a customer as a one-time check to pay sum certain bills.  Consumers purchase MEMO money orders from third-party delegates that charge the consumers the face amount requested together with a fee.  According to MEMO, the continued vitality of its business depends on earning small up-front fees from the sale of money orders, and state-authorized service fees assessed against money orders that are not redeemed.  The assessment of service charges is printed on the back of each MEMO money order.

Prior to the enactment of Chapter 25, New Jersey's Unclaimed Property Act provided that "any sum payable on a money order or similar written instrument that has been outstanding for more than seven years after its issuance is presumed abandoned unless the owner, within seven years, has communicated in writing with the issuer concerning it . . . ."  Under the Act, MEMO is a "holder" of money orders it issues, and the purchaser is the "owner," "apparent owner," or "remitter" of the money order.  See N.J.S.A. 46:30B-6b, 46:30B-6k and 46:30B-6q.  As a holder, MEMO is deemed "a person, wherever organized or domiciled, who is the original obligor indebted to another on an obligation."  N.J.S.A. 46:30B-6g.

Furthermore, the Unclaimed Property Act permits the holder of a money order to impose a dormancy fee.  However, the pre-amendment version imposed two limitations: (1) "[a] holder may

not deduct from the amount of a travelers check or money order any charge imposed by reason of the failure to present the instrument for payment unless there is a valid and enforceable written contract between the issuer and the owner of the instrument pursuant to which the issuer may impose a charge and the issuer regularly imposes the charges and does not regularly reverse or otherwise cancel them;" and (2) "[t]he amount of the deduction shall be limited to an amount that is not unconscionable."

Chapter 25 amends N.J.S.A. 46:30B-13 by altering the limitation on allowable money order dormancy fees by replacing the word "unconscionable" with language which provides that such fees "shall be limited to an amount not to exceed $2.00 per month." N.J.S.A. 46:30B-13. Significantly, Chapter 25 also shortened the presumptive abandonment period for money orders from seven years to three years. See N.J.S.A. 46:30B-12 (". . . any sum payable on a money order or similar written instrument that has been outstanding for more than three years after its issuance is presumed abandoned unless the owner, within three years, has communicated in writing with the issuer concerning it or otherwise indicated an interest as evidenced by a contemporaneous memorandum or other record on file prepared by an employee of the issuer."). According to MEMO, because this provision applies retroactively, MEMO is obligated under Chapter 25 to remit $910,000.00 to the State, rather than approximately $93,000.00 under the original Unclaimed Property Act.

Plaintiff filed its Verified Complaint on October 21, 2010, alleging that Chapter 25 violated several federal and state constitutional provisions and seeking declaratory and injunctive relief. Subsequently, the Court issued an Order to Show Cause. In addition to opposing Plaintiff's motion for injunctive relief, Defendants move to dismiss the Verified Complaint on immunity and/or abstention grounds. Prior to the filing of the instant action, various plaintiffs filed separate

3

complaints challenging the constitutionality of Chapter 25, raising similar arguments made by Plaintiff here. Those plaintiffs also moved for preliminary injunction, and to address the motions, the Court held a hearing on October 21, 2010, the same day MEMO filed its Verified Complaint. On November, 13, 2010, the Court decided those motions.

## DISCUSSION

### I.    Immunity and Abstention

As a preliminary matter, Defendants move to dismiss this case contending that they are immune under the Eleventh Amendment, and this Court should abstain, pursuant to Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943), from hearing this case because Plaintiff essentially challenges central components of New Jersey's policy with regard to abandoned property. In that connection, Defendants caution that federal review of Plaintiffs' claims will disrupt New Jersey's continued efforts to integrate Chapter 25 within a policy of protecting unclaimed property. Defendants take the same position in this regard as in the other related cases, and the Court discerns no distinction in the cases warranting different treatment. Because the Court has previously rejected Defendants' arguments here and explained at length in its Opinion dated November 13, 2010, that Defendants are not immune from suit and that the Court has no basis to abstain under Burford, the parties can refer to the Court's Opinion for those explanations. See Opinion dated November 13, 2010, Sections I, II.

The Court also notes that Plaintiff indicated in its Reply Brief that there are two companion state cases currently pending in the Appellate Division, captioned MEMO Money Order Co. Inc. v. State of New Jersey, wherein Plaintiff challenges the State's capping of dormancy fees for money orders. During a telephone conference with the parties on November 15, 2010, the Court confirmed

4

that because these state proceedings do not relate to any of the constitutional challenges in this action, those cases do not provide a basis for the Court to abstain.

## II.    Standard of Review

Plaintiff moves to preliminarily enjoin the implementation of Chapter 25. The Third Circuit Court of Appeals has outlined four factors that a court ruling on a motion for a preliminary injunction must consider: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. Crissman v. Dover Downs Entertainment Inc., 239 F.3d 357, 364 (3d Cir. 2001) vacated on other grounds by 254 F.3d 467 (3d Cir. 2001). The above factors merely "structure the inquiry" and no one element will necessarily determine the outcome. The court must engage in a delicate balancing of all the elements, and attempt to minimize the probable harm to legally protected interests between the time of the preliminary injunction to the final hearing on the merits. Constructors Association of Western Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir.1978). The movant bears the burden of establishing these elements. Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000).

The Court will first turn to the parties' contention with respect to the first factor—likelihood of success.

## III.    Likelihood of Success

### A.    Contracts Clause

The Contracts Clause, found in Article I, § 10, of the Constitution, states that "No State shall ... pass any ... Law impairing the Obligation of Contracts." To ascertain whether there has been a

5

Contract Clause violation, a court must first inquire whether the change in state law has "operated as a substantial impairment of a contractual relationship." General Motors v. Romein, 503 U.S. 181, 186 (1992) (quotation omitted); Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1243 (3d Cir. 1987); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411 (1983). See also Transport Workers Union of America, Local 290 By and Through Fabio v. Southeastern Pennsylvania Transp., 145 F.3d 619, 621 (3d Cir. 1998). "Thus, Contract Clause analysis requires three threshold inquiries: (1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial." Transport Workers, 145 F.3d at 621.

In this connection, the Court focuses its inquiry upon existing contracts—prospective application of a statute does not implicate the Contract Clause. See Troy Ltd. v. Renna, 727 F.2d 287, 296-99 (3d Cir. 1984) (describing contract clause as impairing existing contracts). If the court concludes that the challenged statute works a substantial impairment, the court must then engage in a careful examination of "whether the law at issue has a legitimate and important public purpose." Transport Workers, 145 F.3d at 621. Finally, the court must consider "whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." Id.

MEMO's Contract Clause argument is two-fold. First, MEMO argues that it has a contractual right to charge a monthly dormancy fee[2] on unredeemed money orders for seven years, and that Chapter 25 substantially impairs that right by retroactively shortening the abandonment

---

[2]      The Court will use the terms "dormancy fee" and "service fee" interchangeably in this Opinion.

period to three years.  Second, MEMO argues that its contracts with its retail agents are impaired by Chapter 25 because, by shortening the abandonment period, the statute undermines the business model upon which MEMO's agency contracts were negotiated.

At the outset, the Court notes that the Unclaimed Property Act grants money order licensees like MEMO the right to withhold dormancy or service fees from the amount transferred to the State upon abandonment.  That provision states that a money order holder

> may not deduct from the amount of a . . . money order any charge imposed by reason of the failure to present the instrument for payment *unless there is a valid and enforceable written contract between the issuer and the owner of the instrument pursuant to which the issuer may impose a charge and the issuer regularly imposes the charges and does not regularly reverse or otherwise cancel them.*

N.J.S.A. 46:30B-13 (emphasis added).  Another provision of the Unclaimed Property Act generally provides that a holder may "deduct from the amount due a person who has a legal or equitable interest in any property subject to [the Unclaimed Property Act] any charges due to dormancy or inactivity [where] there is an enforceable written contract between the holder and the owner of the property pursuant to which the holder may impose a charge; and the holder regularly imposes charges ...."  N.J.S.A. 46:30B-7.2.  Although the parties have not discussed the import of these provisions, the Court finds these provisions critical to its analysis of whether MEMO has a contractual right to collect service charges on its existing contracts.

It is the Court's view that the foregoing statutory language grants MEMO the right to withhold from the amounts it submits to the State those service fees it has already charged. So, for example, on a money order sold in October 2004, MEMO has presumably charged a per-month

7

service fee for five of the past six years.[3]  Under N.J.S.A. 46:30B-13, MEMO is entitled to retain the fees it has already charged as long as it had a valid and enforceable written contract, and it regularly imposed the charge.  In this hypothetical, the prospective effect of Chapter 25 is that MEMO will not be permitted to recover the last year of service charges that it could have recovered under the pre-Chapter 25 law if the payee did not cash the money order within seven years.  Similarly, for a money order sold in October 2008, MEMO would be permitted to retain the service fees already charged.  But, because the 2008 money order will now be subject to the three-year abandonment period, MEMO will never recover any service fees beyond that three-year period.

My view on the retroactive application of Chapter 25 is buttressed by the absence of any indication by the Legislature that it intended to require money order licensees to disgorge fees it already realized.  When MEMO charges its monthly service fee, it contemporaneously deducts and realizes that fee.  There is no indication in the language, structure, or sparse legislative history of Chapter 25 of a retroactive intent with respect to these already-realized fees.  Indeed, that the Legislature did not disturb either N.J.S.A. 46:30B-13 or N.J.S.A. 46:30B-7.2 when enacting Chapter 25 suggests that it intended for those provisions to retain their full force and effect.[4]  See DePalma v. Building Inspection Underwriters, 350 N.J.Super. 195, 226 (App. Div. 2002) (suggesting that when the Legislature intends to supercede a provision it expressly amends or deletes that existing

---

[3]     As noted supra, that amount could have been $2.00 or $.25 depending upon the statutes and/or regulations in effect at the time.

[4]     There is, also, no indication that the Legislature intended to implicitly repeal those provisions.  See Creque v. Luis, 803 F.2d 92, 95 (3d Cir. 1986) ("Th[e] doctrine of repeal by implication has been employed narrowly, and is generally disfavored as a means of statutory construction. It is thus applied only where strictly necessary, and as an interpretative tool of last resort.") (internal citation omitted).

provision).  To the contrary, Chapter 25 amends N.J.S.A. 46:30B-13's language to add a $2.00 monetary cap on the service fee, and precludes the imposition of fees "within the twelve months immediately following the date of sale," Chapter 25, § 4, while leaving the remainder of N.J.S.A. 46:30B-13 intact.[5]  Further, the State has not indicated in its briefing before this Court that it intends to require MEMO to disgorge already-realized fees.[6]

Turning to MEMO's express contractual arrangement with its customers, MEMO argues that each money order constitutes an express contract with provisions on the reverse side stating that the customer agrees to pay a monthly dormancy charge after a defined period of time from the date of purchase until the money order is redeemed.  By way of example, MEMO provided a copy of the reverse side of one of "Personal Money Orders," which provides for the service charge to begin to accrue after within two years of the date of purchase:

---

[5]      In the text of Chapter 25, the amendment to N.J.S.A. 46:30B-13 is indicated as follows:

> A holder may not deduct from the amount of a travelers check or money order any charge imposed by reason of the failure to present the instrument for payment unless there is a valid and enforceable written contract between the issuer and the owner of the instrument pursuant to which the issuer may impose a charge and the issuer regularly imposes the charges and does not regularly reverse or otherwise cancel them. The amount of the deduction shall be limited to an amount [that is not unconscionable] not to exceed $2 per month. Notwithstanding any provision of this section to the contrary, no service charge, dormancy fee or other similar charge shall be imposed against a travelers check or money order within the twelve months immediately following the date of sale.

[6]      For this reason, I reject MEMO's suggestion, in the Butler Declaration, that retroactive application of Chapter 25 will require it to "revers[e] dormancy fees it has already taken ...."  Butler Decl., ¶ 3(a).

9

> In the event that the Money Order is not presented for payment within two (2) years of the purchase date, there will be a non-refundable service charge assessed *where permitted by law*.  The service charge will be deducted from the face value of the Money Order.  The service charge is $2.00 per month from the date of purchase, but not more than $168.00 .... The service charge is subject to change without notice.[7]

Butler Decl., Exh. A at 2 (emphasis added).  Another money order, titled "International Money Order," includes similar language, and the salient differences are that the service charge begins to accrue "within one (1) year of the purchase or within such other time as prescribed by law," and the service charge is "three dollars ($3.00) per month from the date of purchase or such lesser amount *as may be permitted by applicable law*."  Id. at 2 (emphasis added).

While MEMO contends that the language in both types of money orders grant it the contractual right to collect service fees on an ongoing basis during a seven-year period, the Court must reject such an expansive characterization of MEMO's contractual right.  On its face, the Personal Money Order service charge provision acknowledges that the service charge is collectible only "where permitted by law."  For this reason, MEMO cannot reasonably argue that it has an unencumbered right to collect the service charge for a seven-year period.  The "where permitted by law" language explicitly recognizes the State's (or other governmental entity's) right to alter the service charge provision.  Furthermore, the language in both types of money orders that the "service charge is subject to change without notice" bespeaks of MEMO's recognition that the terms of the service charge with its customers are fluid, and at least for the Personal Money Order, MEMO has only established a ceiling ("not more than $168.00") and not a floor for the charges.

---

[7]      The omitted language refers to a different charge applied to money orders purchased in the State of Maryland.

Indeed, the imposition of service charges has been consistently regulated by New Jersey statutes and Treasury regulations. Beginning in 2002, the Legislature limited licensees to $2.00 per month charges. 2002 N.J. Laws. 35, § 12. That amount was reduced to $0.25 per month by a regulation effective in November 2005. 37 N.J. Reg. 4390(a). Then, in 2007, the Legislature reimposed the $2.00 restriction for money orders issued after April 12, 2008. 2007 N.J. Laws. 326.

While the Court appreciates MEMO's argument that the contract language in the Personal Money Orders explicitly grants MEMO the right to collect up to $168.00 in service fees, and that amount represents a seven-year abandonment period under the unclaimed property law in effect at the time that MEMO entered into its contract with the purchaser, the $168.00 limitation cannot overcome the contract's "where permitted by law" language, nor the history of service charge regulation by the State, nor the contract's acknowledgment that the service charge is subject to change without notice. The same analysis applies with equal force to MEMO's International Money Order because the provision on the reverse side of that money order states that the service charge is "three dollars ($3.00) per month from the date of purchase or such lesser amount *as may be permitted by applicable law*." Id. (emphasis added). Like the Personal Money Order language, this language acknowledges that MEMO's right to charge and/or collect its service charges may be altered by law.

Accordingly, I conclude that MEMO has failed to demonstrate that it has an unencumbered contractual right to collect service charges for a full seven-year abandonment period. Rather, MEMO has a contractual right to those service fees it has already realized under its existing contracts. The question, then, is whether Chapter 25 has impaired that contractual relationship and, if so, whether that impairment is substantial. See Transport Workers, 145 F.3d at 621. Because I

11

construe N.J.S.A. 46:30B-13 or N.J.S.A. 46:30B-7.2 as permitting MEMO to retain its already-realized service fees, MEMO cannot reasonably argue that Chapter 25 impairs its contractual right with its customers.  Hence, for this reason, its Contract Clause claim based on its contracts with customers fails.

With respect to MEMO's contracts with its agents, MEMO provided the Court with its standard "Trustee Agreement."  Butler Decl., Exh. B at 1 ("Trustee Agmt.").  The agreement generally provides that the agent is permitted to sell money orders that will ultimately be redeemed by MEMO and, in exchange for being permitted to sell the money orders, the agent is charged a fee. Id., ¶ 6.  The standard blank form provided to the Court does not specify the amount of the fee, but the Butler Declaration avers that MEMO charges a $0.26 fee per money order to its agents.

The Trustee Agreement does not contain any explicit provisions dealing specifically with escheat laws and abandonment periods, see id. at 1-5; hence MEMO does not argue that any explicit provision of the agreement was impaired.  Rather, MEMO argues that pre-Chapter 25 law created an implied term in the Trustee Agreement.  According to MEMO, the small $.26 per-instrument fee it charges to the agents is "based on a business model adopted in reliance on the provisions of the original [pre-Chapter 25 Unclaimed Property] Act."  Pl. Reply at 17.

MEMO is correct to not base its argument on any express terms in the Trustee Agreement. As with the language on the reverse side of the money orders, the Trustee Agreement acknowledges the heavily regulated nature of money order transactions by providing:

> Both MEMO and Trustee are subject to and shall abide by . . . *all federal, state, and local laws and regulations applicable to their respective businesses and services provided.*  They are to include but are not limited to: (a) State licensing laws; (b) the Bank Secrecy Act and its regulations; (c) Federal cash reporting requirements and

12

> regulations; (d) State Currency reporting requirements; (e) Federal
> and/or State anti-money laundering laws and all rules and regulations;
> (f) all applicable state money transfer or sale of check laws regulation
> and administrative agency rulings and/or orders; (g) all federal and
> state privacy laws and regulations; and (h) the USA Patriot Act.

Id. at 4 (emphasis added).  Just as with its contracts with consumers, MEMO has not demonstrated

through its Trustee Agreement that it has an unencumbered contractual right to recover the service

charge for up to seven years.  The Trustee Agreement language recognizes that, at all points in time

during which a money order remains unclaimed, governmental authorities retain the right to enact

laws affecting MEMO's rights under the agreement. Moreover, unlike its contracts with consumers,

there is no provision in the Unclaimed Property Act authorizing MEMO to withhold the fees it

charges its agents. Therefore, there is no express contractual right in the Trustee Agreement that

could be impaired by Chapter 25.

In terms of an implied contract term, MEMO appears to argue that its investment-backed

expectations rooted in the pre-Chapter 25 law should be implied into the Trustee Agreement.  This

Court rejected a similar argument made by American Express Travel Related Services Company,

Inc. in its Opinion dated November 13, 2010.  In that opinion, I reasoned that

> while in a Contract Clause analysis, the expectations of the parties to
> the contract and reliance upon state law at the time of the contract
> play a role in determining the substantiality of the contractual
> impairment, an important factor in determining the parties'
> expectations is whether the parties were operating in a regulated
> industry.

Opinion dated November 13, 2010, Section V.A.2 (citing Mercado-Boneta v. Administracion del

Fondo de Compensacion al Paciente, 125 F.3d 9, 13 (1st Cir. 1997)).  Here, as indicated above, the

sale of money orders in New Jersey is highly regulated and even expressly recognized in the text of

13

MEMO's contract with its consumers.  Thus, I find the analysis in my prior opinion equally applicable here.

MEMO seeks to overcome this result by relying on the Supreme Court's decision in Eastern Enterpr. v. Apfel, 524 U.S. 498, 118 S.Ct. 2131 (1988).  In that case, a plurality of the Supreme Court stated:

> Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree, particularly where it is "confined to short and limited periods required by the practicalities of producing national legislation." Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

Id. at 528.  MEMO argues that this language supports its position that Chapter 25 substantially interferes with its "reasonable investment-backed expectations." Pl. Reply at 21 (citing Eastern, 524 U.S. at 532).

The Court finds MEMO's reliance on Eastern unpersuasive.  As explained in more detail in my Takings Clause analysis, the question of how to interpret the Supreme Court's splintered opinion, as well as its *stare decisis* effect, has been the subject of several Third Circuit opinions.  See e.g., Berwind Corp. v. Comm'r of Soc. Sec., 307 F.3d 222, 224 (3d Cir. 2002); Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d 161 (3d Cir. 1999); Unity Real Estate Co. v. Hudson, 178 F.3d 649 (3d Cir. 1999).  Second, the plurality did not rest its analysis on the Contract Clause but on Substantive Due Process grounds, instead.  See Berwind, 307 F.3d at 234.  And, third, the Third Circuit has applied Eastern's holding solely to cases involving the retroactive application of the Coal

14

Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722 (the "Coal Act")—the statute at issue in Eastern.  See e.g., Berwind, 307 F.3d at 224, Anker, 177 F.3d at 164, Unity, 178 F.3d at 652.

MEMO's argument that Chapter 25 imposes "severe" retroactive liability on a limited class of parties that could not have anticipated the liability is not without some intuitive force.  However, MEMO is not the only entity subjected to a reduction in the abandonment period for the intangible property it holds—Chapter 25 reduced the time period applicable to travelers checks as well.  Further, Chapter 25 is prospectively enforceable against stored value cards.  Moreover, that this Court reads Chapter 25 as permitting MEMO to retain its already-realized fees makes clear that no severe retroactive liability is imposed.

In a related fashion, MEMO attacks the State's reliance on language in Texas v. New Jersey, 379 U.S. 674 (1965) and Twiss v. State, 124 N.J. 461 (1991), indicating that the retroactive application of escheat laws is constitutional.  Twiss, a New Jersey Supreme Court case interpreting New Jersey's Unclaimed Property Act, discussed retroactive application of the Act.  That case involved a claim brought by an heir hunter who sought access to names and addresses of the owners of abandoned property held by the State.  The precise question before that Court was whether "the Legislature intended to give retroactive effect to the [Unclaimed Property Act], so that it governs the Treasury's obligation to disclose information concerning all such accounts, no matter when created."  Id. at 914.  While recognizing that courts generally disfavor retroactive application of statutes, it made clear that "[c]ourts will apply statutes retroactively when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should be so applied; when the statute is curative; or when the reasonable expectations of those affected by the statute warrant such

application." Id. at 916.  In that connection, the Court framed its inquiry as: (1) "whether the Legislature intended to give the statute retroactive application," and (2) "[i]f so, . . . whether retroactive application is an unconstitutional interference with 'vested rights or will result in a 'manifest injustice." Id.

The Twiss Court applied canons of statutory interpretation to conclude that the legislature intended for the Act to apply both prospectively and retroactively.  Id.  Thereafter, the Court considered whether any vested right or manifest injustice was implicated.  It concluded that the plaintiff heir hunter could point to no vested right impaired by retroactive application, and that there was no manifest injustice in applying the statute retroactively to him.  Id. at 916-17.

I agree with MEMO that the Twiss decision is not particularly relevant, in light of its distinguishable facts.  The Supreme Court's interpretation of the Legislature's intent in enacting the statute is certainly helpful, but the question of vested rights and manifest injustice is addressed specifically with respect to the plaintiff in that case.  Thus, its analysis of those latter questions of constitutional import is not instructive here.  Moreover, a post-Twiss decision by the New Jersey Supreme Court calls into question the viability of the "vested right" doctrine, stating that "in place of the 'vested rights' inquiry we will apply rational basis scrutiny, as that standard has been articulated by the United States Supreme Court in its contemporary legislative retroactivity decisions." Nobrega v. Edison Glen Assoc., 167 N.J. 520, 544 (2001).

However, I find the State's argument with respect to the retroactive application of Texas to be appropriate.  As explained in more detail in my Opinion dated November 13, 2010, Texas created two priority rules by which it is determine what state has the right to escheat intangible property such as money orders.  The primary rule grants "the right and power to escheat the debt should be

16

accorded to the State of the <u>creditor's last known address</u> as shown by the debtor's books and records."[8]  <u>Texas</u>, 379 U.S. at 680-81.  Where the creditor's last known address is unknown, or where the last known address is in a state that does not provide for the escheat of the abandoned property, the second priority rule comes into play.  <u>Id.</u> at 682.  Under that rule, the right to escheat is awarded to "the debtor's State of corporate domicile ...."  <u>Id.</u> at 683.  The Court agrees with MEMO's observation that there is no language in <u>Texas</u> addressing retroactivity; however, in <u>Pennsylvania v. New York</u>, 407 U.S. 206 (1972), a case interpreting <u>Texas</u>, the Supreme Court rejected an argument by the State of New York that <u>Texas</u> did not apply to "money orders purchased between 1930 and 1958 (seven years before the <u>Texas</u> decision)."  <u>Pennsylvania</u>, 407 U.S. at 212-16 (alterations mine).  Rather, the Supreme Court directed that New York determine the creditor's last known address in order to apply the primary rule.  <u>Id.</u> at 216.

In sum, with respect to its contracts with its customers, MEMO has a contractual right to retain those service fees it has already realized.   Chapter 25, however, does not impair this contractual right because it does not preclude MEMO from retaining those fees.  To be clear, the Contract Clause does not prohibit the State from retroactively imposing the newly enacted three-year abandonment period to existing contracts—the Court simply interprets the Unclaimed Property Act as permitting MEMO to retain its already-realized service fees.  In terms of MEMO's Trustee Agreements with its agents, MEMO has not pointed to an express or implied contract term impaired

---

[8]      A creditor "might be either a payee or a sender: 'the payee of an unpaid draft, the sender of a money order entitled to a refund,' or a payee or sender 'whose claim has been underpaid through error."  <u>Delaware</u>, 507 U.S. at 503 (quoting <u>Pennsylvania v. New York</u>, 407 U.S. 206, 213 (1972)).  A debtor, in the escheat context, is typically the issuer of a money order, stored value card, or other obligation.  <u>See id.</u> at 504.  The precise determination of the debtor-creditor relationship depends upon state law.  <u>Id.</u> at 503-04.

by Chapter 25.  Accordingly, I conclude that MEMO has not demonstrated a likelihood of success on its Contracts Clause claims, and its preliminary injunction request on this basis is denied.

> **B.      Takings Clause**

The Takings Clause prohibits states from taking private property for public use without just compensation.  U.S. Const. Amend. V, XIV; <u>County Concrete Corp. v. Town of Roxbury</u>, 442 F.3d 159, 164 (3d Cir. 2006) (citing <u>Cowell v. Palmer Twp.</u>, 263 F.3d 286, 290 (3d Cir. 2001)).  To succeed on a takings claim, a plaintiff must . . . demonstrate that the state's action affected its "legally cognizable property interest."  <u>Prometheus Radio Project v. F.C.C.</u>, 373 F.3d 372, 428 (3d Cir. 2004) (citing  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985) and <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155, 160-61 (1980)).  Where a taking has been effected, the Takings Clause does not prohibit the taking altogether, but merely requires that there be a "public purpose" for it,  and that "just compensation" be paid.  <u>RLR Investments, LLC v. Town of Kearny</u>, Civ. Action No. 09-3100, 2010 WL 2650478, *2 (3d Cir. Jul. 2, 2010).  In terms of public purpose, "[s]tate legislatures have 'broad latitude in determining what public needs justify the use of the takings power,' <u>Id.</u> (quoting <u>Kelo v. City of New London</u>, 545 U.S. 469, 483 (2005)), and courts give 'great respect' to those determinations."  <u>Id.</u> (citation omitted).  In short, a taking is effected for a public use "'where the exercise of the eminent domain power is rationally related to a conceivable public purpose.'"  <u>Id.</u> (quoting <u>Hawaii Housing Auth. v. Midkiff</u>, 467 U.S. 229, 241 (1984)).

As an initial matter, the Court addresses MEMO's argument that its "right to contractual profit" satisfies the property interest element of a takings analysis.  MEMO is correct that a contractual right may constitute a property interest for Takings Clause purposes.  <u>Prometheus</u>, 373

F.3d at 430. Here, however, MEMO's contractual right to retain its already-realized service fees is not affected Chapter 25. Thus, MEMO cannot rely upon its contractual right in support of its Takings Clause claim.

MEMO, additionally, argues that New Jersey's Money Transmitter Act ("MTA"), N.J.S.A. 17:15C-18, creates a "protectable property interest" in the proceeds from money orders sold by MEMO's agents. See Pl. Open. Br. at 17. The MTA directs that

> [a]ll funds (less fees) received by an authorized delegate of a licensee from the sale or delivery of a payment instrument issued by a licensee or received by an authorized delegate for transmission shall, from the time the funds are received by an authorized delegate until that time when the funds or an equivalent amount are remitted by the authorized delegate to the licensee, *constitute trust funds owned by and belonging to the licensee*. If an authorized delegate commingles any trust funds with any other funds or property owned or controlled by the authorized delegate, all commingled proceeds and other property shall be impressed with a trust in favor of the licensee in the amount equal to the amount of the proceeds due the licensee.

N.J.S.A. 17:15C-18f (emphasis added). Focusing on the "constitute trust funds owned by and belonging to the licensee" language found in this provision, MEMO argues that this provision acknowledges MEMO as the "owner" of the money order proceeds, thereby creating a property interest in those funds.

To further its position, MEMO relies on Merchants Exp. Money Order Co. v. Sun Nat. Bank, 374 N.J. Super. 556, 560 (App. Div. 2005), a New Jersey Appellate Division case in which MEMO was the plaintiff. At issue in Merchants was whether the MTA precluded a bank from freezing funds held in an agent's account at the bank, when the account funds included money order proceeds held on behalf of the money order licensee. The court ruled that, while the agent's general operating funds could be frozen by the bank, the money order proceeds did not belong to the agent and,

19

therefore, could not be frozen.  In reaching this conclusion, the court stated that the money order proceeds

> w[ere] money belonging to another entity, of course, MEMO, and not something that the bank had the right to seize .... funds seized by [the bank] from the [agent's] operating accounts contain[ed] funds into which money order receipts had been commingled were impressed with a trust in favor of plaintiff to the extent of the amounts owed to it from money order sales.

Id. at 565.

It is clear from the face of the MTA, and the context of Merchants, that both speak merely of the agency relationship between MEMO and its agents, which agents are obligated to hold the money order proceeds on MEMO's behalf until they transfer the proceeds to MEMO.  The case says nothing about MEMO's ownership of the money order proceeds vis-a-vis the payee, who is the beneficial owner of the money order proceeds.  See Pennsylvania v. New York, 407 U.S. 206, 214 (1972) (describing payee as creditor ultimately entitled to recover funds if not abandoned).  Hence the Court rejects MEMO's argument that it has a protectable property interest in money order proceeds based on either the MTA or Merchants.  To the contrary, and like other holders of unclaimed intangible property, MEMO is a debtor to the payee of the money order.

In addition, MEMO relies on the Eastern Enterpr. v. Apfel, 524 U.S. 498, 118 S.Ct. 2131 (1988), line of cases to argue that the retroactive application of Chapter 25 violates the takings clause.  That line of cases addresses whether retroactive application of the "Coal Act", which embodied a modification of prior employer benefit plans created for coal miners, violates the takings clause by altering the business expectations of coal mine-employers who were obligated to provide certain benefits to the miners.  See Berwind, 307 F.3d at 224 ("The Coal Act was enacted in 1992

20

to resolve the imminent insolvency of multi-employer trusts created by coal industry agreements.) (internal quotation marks and citation omitted).  As noted, a plurality of the Supreme Court stated, in concluding that the Takings Clause was violated, that:

> Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree, particularly where it is "confined to short and limited periods required by the practicalities of producing national legislation." Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

Eastern, 524 U.S. at 528.

As indicated in connection with my Contract Clause analysis, one problem with MEMO's reliance on the Eastern line of cases is that the Third Circuit has explicitly held that Eastern's plurality holding is not binding in the takings context.  The Third Circuit explained, in Unity Real Estate, that the Circuit is "bound to follow the five-four vote *against* the takings claim ...."  178 F.3d at 659 (emphasis added).  See also Berwind, 307 F.3d at 234.  Accordingly, MEMO's reliance on that line of cases in connection with its takings claim is improper.

Finally, to the extent that MEMO argues it has a property interest in the dormancy fees that it charges, the Court likewise rejects that argument.  Whether there exists a property interest, for takings purposes, is determined by reference to state law.  Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 130 S. Ct. 2592, 2609 (2010).  As noted, New Jersey's Unclaimed Property Act provides that

> [a] holder may not deduct from the amount of a travelers check or money order any charge imposed by reason of the failure to present

the instrument for payment *unless there is a valid and enforceable written contract between the issuer and the owner of the instrument pursuant to which the issuer may impose a charge* and the issuer regularly imposes the charges and does not regularly reverse or otherwise cancel them.

N.J.S.A. 46:30B-13 (emphasis added).  Because this statutory provision explicitly precludes money order licensees from deducting dormancy charges except where they have entered into a contract with the purchaser permitting such fees, it follows that there is no inherent property interest in the dormancy fees themselves under state law apart from the contractual undertaking permitting the imposition of those fees.  Accordingly, for the foregoing reasons, I conclude that MEMO has not demonstrated a likelihood of success on its takings claim.

### C.    Substantive Due Process

Having found that Plaintiff has no property interest, in the context of either the Contract or Takings Clause, in the proceeds from the sales of the money orders, or in the dormancy fees that have not been realized, the Court next determines whether the State's bases in enacting Chapter 25 are irrational under the Substance Due Process,[9] and for the following reasons, the Court holds that MEMO has not met its heavy burden of showing that it is likely to succeed on this claim.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  The Supreme Court has long held that the clause has a substantive component.  See, e.g., Planned Parenthood of S.E. Pennsylvania v. Casey, 505 U.S. 833, 846-47 (1992) ("it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure")

---

[9]    Because the analysis of the Substantive Due Process here is substantially similar to the one the Court made in its previous Opinion dealing with Plaintiff American Express Travel Related Services Co., Inc.'s ("Amex") arguments, the Court will refer to those discussions.

(quoting Whitney v. California, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)).  Typically, "a legislative act will withstand substantive due process challenge if the government 'identifies a legitimate state interest that the legislature could rationally conclude was served by the statute,' although legislative acts that burden certain 'fundamental' rights may be subject to stricter scrutiny." Id. (quotations and citations omitted); see Alexander v. Whitman, 114 F.3d 1392, 1403 (3d Cir. 1997).  The first step in any substantive due process analysis is to determine the standard of review. "The choice of a standard of review . . . turns on whether a 'fundamental right' is implicated." Sammon v. New Jersey Bd. of Medical Examiners, 66 F.3d 639, 644 (3d Cir. 1995) (citations omitted).  Here, the parties do not dispute that the rational basis test applies in this case.

This Court previously explained that where rational basis review is appropriate, "a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute."  Id.  In determining whether a law comports with substantive due process, the inquiry is whether the law is rationally related to a legitimate state interest.  Rogin v. Bensalem Township, 616 F.2d 680 (3d Cir. 1980), cert. denied, 450 U.S. 1029 (1981); see Opinion dated November 13, 2010.  "The law need not be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." 616 F.2d at 689 (quoting Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88 (1955)); see also Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992).

The Third Circuit has repeatedly cautioned that a court engaging in rational basis review is not entitled "to second guess the legislature on the factual assumptions or policy considerations

23

underlying the statute. If the legislature has assumed that people will react to the statute in a given way or that it will serve the desired goal, the court is not authorized to determine whether people have reacted in the way predicted or whether the desired goal has been served." Sammon, 66 F.3d at 645. The sole question is "whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served." Id. When legislation is being tested under rational basis review, "'those challenging the legislative judgment must convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker.'" Id. (quoting Vance v. Bradley, 440 U.S. 93, 111 (1979)); see also Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1034-35 (3d Cir.), cert. denied, 482 U.S. 906 (1987).

Indeed, "those attacking the rationality of the legislative classification have the burden 'to negat[e] every conceivable basis which might support it.'" FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)); see, e.g., Heller v. Doe, 509 U.S. 312, 319-20 (1993) (finding that laws scrutinized under rational basis review are "accorded a strong presumption of validity"); Hodel v. Indiana, 452 U.S. 314, 331-32 (1981). Ordinarily, that burden is insurmountable. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Heller, 509 U.S. at 321 (internal quotations and citations omitted).

Importantly, a state need not provide justification or rationale for its legislative decision. Indeed, the Supreme Court has held that "legislative choice[s] [are] not subject to court factfinding

and may be based on rational speculation unsupported by evidence or empirical data." Beach Communications, 508 U.S. at 315l; see Merrifield v. Lockyer, 547 F.3d 978, 989 (9th Cir. 2008) (state action survives rational basis review if "there is any reasonably conceivable [set]of facts that could provide a rational basis for the challenged law" (quoting Beach Communications, 508 U.S. at 313 (internal quotation marks omitted))).  The rationale for such a deferential standard is that the legislative process will, from time to time, yield imperfect results, but "[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." Lehnhausen, 410 U.S. at 365 (quoting Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 510 (1937)).   Nevertheless, the rational basis test is not a "toothless" one, Mathews v. Lucas, 427 U.S. 495, 510 (1976), and "it is the function of courts . . . to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." Nebbia v. New York, 291 U.S. 502, 536 (1934).

In the present case, MEMO's argument starts with the erroneous proposition that the only proper purpose of any escheat statute is to reunite individuals with their lost property.  In that connection, MEMO contends that there is virtually no possibility of reuniting an unredeemed money order with its purchaser because there are no requirements for MEMO to keep records of purchasers, such as names or addresses, unless the transaction is in the bulk amount of $3000.00 or more.  The Court rejected similar arguments Amex advanced by concluding that as a general principle, New Jersey's Unclaimed Property law is a remedial statute and in that respect, the State has a strong interest in protecting its consumers.  See Opinion dated November 13, 2010 at pp. 32-34; see also Clymer v. Summit Bancorp., 171 N.J. 57, 67 (2002).

Indeed, the statute's purpose is not solely to reunite consumers with their property; under the scheme of escheat law, the State is the preferred holder of abandoned property regardless of whether the property is eventually returned to its rightful owner because when states serve as custodians of abandoned property, "[s]uch property thus escapes seizure by would-be possessors and is used for the general good rather than for the chance enrichment of particular individuals or organizations." Standard Oil, 341 U.S. at 436; see Opinion dated November 13, 2010 at pp. 35-36.  Moreover, the Court also found that the abandonment period is irrelevant to whether the State has possession of the names and address of the owners.[10]  More to the point, if the State does not have any information pertaining to the money orders at the end of the three-year period, it certainly would not have any more information after seven years.  Therefore, the ability of the State to reunite property with its owner has little bearing on the time frame when the State determines to escheat.  See Opinion dated November 13, 2010 at pp. 33-34.  A challenge in this regard would be an attack on the State's general ability to escheat, which is a right the Court has found, and the parties concede, is within the State's sovereignty.  In addition, MEMO has not come forth with any credible evidence that it would be a better custodian than the State, because MEMO also lacks the names and addresses of the purchasers MEMO contends are necessary in order to reunite them with their property.

MEMO next maintains that the best hope for reuniting purchasers with their property is to give them more time to redeem each money order and that shortening the abandonment period increases the risk that the purchaser will be deprived of property because the money order's utility as an instrument of saving would be eroded.  MEMO's argument is specious because MEMO's

---

[10]      However, the statute requires that both the State and the holder attempt to restore the property to the owner through notice.  N.J.S.A. 46:30B-50, -51.  The Unclaimed Property Administration's website provides additional means to advertise and provide notice to the owners.

position does not take into account the fact that the State holds the abandoned property in perpetuity for the benefit of the property owner.  Hence, property owners are never deprived of their right to reclaim their property.  Clymer, 171 N.J. at 63 ("all unclaimed funds are held by the Treasurer as trustee for the public interest"(citations and quotations omitted)).

MEMO next argues that Chapter 25's true purpose is to raise revenue in order to "plug" the State's budget deficit.  However, the State enjoys the right under the law to transfer a percentage of unclaimed property into the General State Fund, and that fund is held in a fiduciary capacity.  See N.J.S.A. 46:30B-74; Clymer 171 N.J. at 63.  While the Court has commented that it appears that a primary aim of Chapter 25 was to increase the State's coffers, so long as revenue raising was not the only basis for this legislation, it is not the Court's role to decide whether the Legislature's judgment is sound.  See Opinion dated November 13, 2010 at pp. 35, 38.  The Court has already found, and reiterates them here, that there are other rational bases for the enactment of Chapter 25.  As such, MEMO's argument is rejected.[11]

MEMO further argues that there is no basis for the State's position that money orders are presumed abandoned after three years instead of seven years.  For support, MEMO relies on the statistic that, historically, 99% of MEMO money orders are cashed and redeemed within seven years.  However, MEMO's focus is misplaced.  The proper inquiry for the purpose of determining when money orders should be presumed abandoned is the percentage of money orders that were redeemed at the three-year mark.  In fact, the State points to comments from Division of Taxation, Department

---

[11]    Like Amex, MEMO argues that this Court should follow the decision in American Exp. Travel Related Services Co., Inc. v. Hollenbach, 630 F.Supp. 2d 757 (E.D. Ky. 2009), to find that shortening of dormancy period to raise revenue is unconstitutional.  The Court is not persuaded by Hollenbach's legal conclusions because they are based upon factual findings that are not present in this case and case law that does not support that court's holdings.

of Treasury, which tends to show that less than one percent of money orders remain uncashed after one year and even less are cashed thereafter.  See 38 N.J. Reg. 2732(a).  This fact was not disputed by MEMO.  MEMO, however, submits that although the relative percentage of money orders unused after one year is small, the aggregate total dollars represented by those unused money orders is significate, approximately $1 million.  In this regard, MEMO is inviting the Court to review the Legislature's decision using certain empirical data, which is inappropriate when conducting a rational basis review.  "[L]egislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data."  Beach Communications, 508 U.S. at 315l.  Therefore, it is sufficient for the Court to find that as one of its rational bases the State shortened the period of abandonment to three years to reflect consumers' actual timing of redemption for money orders in this state, or to more closely approximate that timing.

An additional consideration for the Court, which was not present in the context of Amex's arguments, is the dormancy fees MEMO charges its customers.  Indeed, through the implementation of Chapter 25, the State advances an additional purpose by limiting the number of years during which a customer would be subjected to dormancy fees.  In other words, Chapter 25 protects purchasers from the devaluation of their property by excessive dormancy fees.[12]  Thus, it is not irrational for the State to set an abandonment period of three years for those money orders that are not redeemed.[13]

---

[12]     The Court rejects, for the same reasons delineated in the previous Opinion, MEMO's argument that the Court should apply a heightened standard of review outlined in United States Trust Co. v. New Jersey, 431 U.S. 1, 25-26 (1977).  See Opinion dated November 13, 2010 at pp. 34-35.

[13]     The Court's conclusion does not foreclose the possibility that there can be a point when the shortening of the presumptive abandonment period may be irrational, which also rings true for any of the types of intangible property controlled by the escheat statute.  However, the Court need

Accordingly, having considered MEMO's arguments, the Court does not find that MEMO has established a likelihood of success on its substantive due process claim.

### D.    Manifest Injustice

Solely as a state created remedy, MEMO relies on the Manifest Injustice Doctrine espoused in Nobrega, supra.  In that case, the New Jersey Supreme Court explained the "manifest injustice test does not flow from constitutional requirements, but instead is based on equitable concerns."  Id. at 545.  The essence of the inquiry, under that doctrine, includes "whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively."  Id. at 546.  That reliance is tempered by "a weighing of the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance."  Id. at 547.

Here, MEMO makes arguments similar to those rejected by this Court in connection with its substantive due process analysis.  MEMO argues, without much explication or support, that it relied on the seven-year abandonment period to its detriment and that the State has no legitimate purpose in retroactively shortening the abandonment period.  Contrary to MEMO's assertion, the Court finds that it is rational for the Legislature to retroactively impose the three year abandonment period.  As explained supra, however, MEMO is entitled to retain the service fees that it has already realized.  Thus, MEMO cannot reasonably argue that the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively.  See OFP, L.L.C. v. State, 395

---

not reach the determination of what that point is because the Court must only consider the precise legislation before it today, and has found that the presumptive three-year period of abandonment as to money orders is rational.

N.J.Super. 571, 595 (App. Div. 2007) (suggesting that "purely economic" interests are protected by the Takings Clause under the U.S. and New Jersey constitutions and, therefore, do not support a finding of manifest injustice).  See also In re University Cottage Club of Princeton New Jersey Corp., 2010 WL 2562215, *8 (N.J.Super. App. Div. Jun 25, 2010) ("[R]etroactive application of new legislation does not constitute manifest injustice simply because a party's expectations are not met.") (internal quotation marks omitted) (citing Harris v. Branin Transp., Inc., 312 N.J.Super. 38, 48 (App. Div. 1998)).  That MEMO may retain those already-realized funds properly balances its interests with the public interest in limiting the amount of service fees charged on abandoned property. Accordingly, I conclude that MEMO has not sufficiently demonstrated a reasonable likelihood of success on the merits of its Manifest Injustice claim.

## IV.    Remaining Preliminary Injunction Factors

In addition to whether the movant has shown a reasonable probability of success on the merits, the remaining preliminary injunction factors are:  (1) whether the movant will be irreparably injured by denial of the relief; (2) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (3) whether granting the preliminary relief will be in the public interest. Crissman, 239 F.3d at 364.  Because MEMO has not shown a likelihood of success with respect to any of its claims, the Court need not address the remaining factors in connection with its motion. As such, MEMO's motion is denied.  Morton v. Beyer, 822 F.2d 364, 371 (3d Cir. 1987) ("[A] failure to show a likelihood of success . . . must necessarily result in the denial of a preliminary injunction.").

## V.    Conclusion

Accordingly, having balanced the injunction factors, the Court denies Plaintiff's motion for

injunctive relief.  Defendant's motion to dismiss based upon immunity and/or abstention grounds

is also denied.


DATED:  November 18, 2010                    /s/ Freda L. Wolfson_____
                                             FREDA L. WOLFSON
                                             United States District Judge

31